**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | |
| **GENOCEA BIOSCIENCES, INC.** | ) | **Chapter 11** |
| | ) | **Case No. 22-10938-CJP** |
| Debtor. | ) | |
| | ) | |

**MOTION BY DEBTOR AND DEBTOR-IN-POSSESSION TO SELL**
**INTELLECTUAL PROPERTY AND RELATED ASSETS BY PRIVATE SALE,**
<u>**FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES**</u>

In accordance with Sections 105, 363, and 365 of 11 U.S.C. §§ 101 *et seq.* (the

"<u>Bankruptcy Code</u>"), Federal Rules of Bankruptcy Procedure 6004, and MLBR 6004, Genocea

Biosciences, Inc., the debtor and debtor-in-possession in this matter ("<u>Genocea</u>" or the

"<u>Debtor</u>"), hereby moves the Court for entry of an order authorizing the Debtor to sell by private

sale pursuant to the terms of a certain Asset Purchase Agreement (the "<u>Sale Agreement</u>")[1] dated

as of August 2, 2022 (the "<u>Effective Date</u>") intellectual property related to the ATLAS platform,

including a portfolio of patents and trademarks, research and clinical trial data, research

materials, and software URLs and related equipment (collectively and as further defined in the

Sale Agreement,  the "<u>Purchased Assets</u>"), free and clear of all liens, claims, encumbrances, and

interests (the "<u>Sale</u>") to Harpy Holdings, LLC or its designee(s) (collectively, the "<u>Buyer</u>").

The Sale Agreement provides that the Purchased Assets shall be sold to the Buyer for the

sum of $2,000,000.   The Debtor shall assume certain executory contracts or unexpired leases (as

hereinafter defined, the "<u>Transferred Contracts</u>") and assign same to the Buyer, and the Buyer

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Sale
Agreement.  The Sale Agreement and exhibits and schedules thereto are attached as <u>Exhibit "A"</u>.  The
exhibits and schedules to the Sale Agreement may be subject to amendment or supplementation.

shall be responsible for the cure costs associated with such assumption and assignment.  The

Debtor submits that the proposed Sale is the result of an extensive marketing effort and

represents the highest offer received for the Purchased Assets, and that consummation of the Sale

is in the best interests of creditors and the estate. In conjunction with the Sale, the Debtor has

simultaneously filed a motion for approval of bid procedures ("<u>Bid Procedures Motion</u>")

provided for in the Sale Agreement in order to provide opportunities for higher counteroffers.

In further support of this motion, the Debtor states as follows:

<u>**JURISDICTION**</u>

1.      This Court has jurisdiction to consider and determine this motion pursuant to 28

U.S.C. § 1334.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b).  Venue is

proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief requested in this motion include Sections

105(a), 363 and 365 of the Bankruptcy Code, Federal Rules of Bankruptcy Procedure 6004 and

6006, and Massachusetts Local Bankruptcy Rules 6004-1 and 6006-1.

<u>**BACKGROUND**</u>

3.   On July 5, 2022 (the "<u>Petition Date</u>"), the Debtor commenced this case by filing a

voluntary petition pursuant to Chapter 11 of the Bankruptcy Code.

4.   The Debtor continues to operate as a debtor-in-possession pursuant to Sections 1107

and 1108 of the Bankruptcy Code.

5.   The Debtor is a biopharmaceutical company that was incorporated in Delaware on

August 16, 2006 and has a principal place of business at 100 Acorn Park Drive in Cambridge,

Massachusetts.

6.    Prior to its prepetition decision to terminate ongoing business operations, the Debtor discovered and developed novel vaccines and immunotherapies to treat a range of diseases. Along with access to clean drinking water and improved public sanitation, vaccines were the greatest driver of improved human longevity of in the 20th century.  The Debtor's founding mission was to extend the vaccine revolution into the 21st century.

7.    The critical enabler of this mission was its proprietary ATLAS™ platform ("Atlas platform"), based on an invention by Darren Higgins, Ph.D., a professor at Harvard Medical School.  This platform enables creation of vaccines that protect primarily through T cell (or cellular) immune responses.  The ATLAS platform has potential for creating innovative, life saving vaccines for two reasons.  First, all approved vaccines are thought to protect primarily through B cell (or humoral) responses.  By harnessing T cells, the ATLAS platform allows development of vaccines against the dozens of pathogens – such as malaria, E. coli, chlamydia, genital herpes and many more – for which effective vaccines do not exist.  The second reason the ATLAS platform represents a potential breakthrough is because of the emerging understanding that T cells can fight tumors and, separately, drive autoimmune disorders such as multiple sclerosis and rheumatoid arthritis.  T cell vaccines and immunotherapies, then, could enable novel therapies in these areas as well.

8.    With an initial focus solely on infectious disease vaccines, the Debtor completed an initial public offering (IPO) in February of 2014, on the NASDAQ capital market with the ticker symbol GNCA.

9.    The Debtor advanced a vaccine candidate to treat genital herpes infections, called GEN-003, through preclinical (animal) studies and early clinical studies that established the safety and tolerability, efficacy and dosing profiles for this vaccine.  The Debtor aimed to start

the Phase 3 (registrational) clinical studies, designed with cooperation from the Food and Drug

Administration (FDA), necessary to confirm the clinical profile for licensure and

commercialization.  Such studies would have enrolled several thousand patients and cost more

than $200,000,000.  However, the Debtor was unable to secure necessary capital.

10. As a consequence, in September 2017 the Debtor announced that it was exploring

strategic alternatives to maximize the value of GEN-003 through sale, partnership or other

means, ceasing all GEN-003 spending and activities, and reducing its workforce by

approximately 40%.  In parallel, the Debtor announced a strategic shift to development of

vaccines and immunotherapies to fight cancer.

11. The Debtor advanced two novel anti-cancer immunotherapies into clinical studies.

The first, GEN-009, is a cancer vaccine program targeting the neoantigens – or patient-specific

tumor mutations – present in a range of tumor types.  The second, GEN-011, is an autologous T

cell therapy targeting neoantigens, meaning that the Debtor isolates the patient's tumor-specific T

cells for growth outside the body and reinfusion as a concentrated attack on the patient's tumor.

12. The output of ATLAS has been clinically validated, with over 1,000 patients screened

via the platform to date, with positive clinical data across four (4) clinical trials in infectious

disease and cancer.

13. While the Debtor's early clinical data for its two clinical stage cancer therapeutic

programs showed promise, the Debtor had insufficient capital to support continued, clinical

development.

14. The Debtor devoted substantially all of its efforts to product research and

development, initial market development, and raising capital.  The Debtor has not generated any

product revenue associated with its primary business purpose to date.

15. The Debtor had a loss from operations of $15,800,000 and used $15,200,000 in cash for operating activities during the three months ending March 31, 2022.

16. On April 28, 2022, the Debtor announced that it had initiated a process for explore strategic alternatives to maximize the value of its assets, including a sale of some or all of the Debtor's assets.

17. In the second quarter of 2022, the Debtor laid off approximately 53 employees.

18. On May 24, 2022, Genocea announced its intention to winddown its business. Shortly thereafter, the Debtor was delisted from NASDAQ.

19. In furtherance of the orderly winddown, the Debtor commenced marketing of its assets for sale with the assistance of Rock Creek Advisors ("Rock Creek"), including its equipment and intellectual property.

20. In early June 2022, the Debtor commenced the marketing process for the Purchased Assets. The Debtor sent a confidential offering memorandum to approximately 400 pharmaceutical, biotechnology, and venture capital/private equity entities. A data room was established. Twelve (12) nondisclosure agreements were executed, and each of those parties accessed the data room.

21. As a result of these efforts, the Debtor engaged in discussions with several potential interested parties, culminating in the negotiation and execution of the Sale Agreement.

22. The Debtor has entered into a consensual cash collateral arrangement with Silicon Valley Bank which requires that the motion to sell the Purchased Assets be filed by August 15, 2022 and that the secured claim of Silicon Valley Bank be paid in full by September 30, 2022.

## THE PROPOSED PRIVATE SALE

### A.      Terms of Sale Agreement.

23. Pursuant to the Sale Agreement, [2] the Purchased Assets[3] will be sold to the Buyer in accordance with Sections 363(b) and (f) of the Bankruptcy Code free and clear of Liens, Claims, Encumbrances, and Interests on an "as is, where is" basis, without representation or warranty except as expressly provided in the Sale Agreement.  Pursuant to the Sale Agreement, the Debtor will assume and assign to the Buyer the Transferred Contracts (as defined herein) in accordance with Section 365(b) of the Bankruptcy Code.   The Buyer shall be responsible for payment of the associated cure costs.

24. In connection with the execution of the Sale Agreement, the Buyer has paid to the Debtor a deposit in the amount of $200,000 (the "Deposit").  At the closing of the Sale to the Buyer (the "Closing"), the Buyer shall pay to the Debtor the balance of the purchase price of $1,800,000, which together with the Deposit shall be the cash purchase price paid at Closing (the "Purchase Price").

25. The Debtor intends, with the assistance of Rock Creek, to solicit counteroffers for the Purchased Assets.  The Bid Procedure Motion seeks approval of certain bid, cure, and notice provisions in connection with the proposed Sale (the "Bid Procedures Order") including, but not limited to, a notice of Sale (the "Sale Notice").  The Debtor shall provide the Sale Notice to all creditors and shall provide the Bid Procedures Order to all parties identified by the Debtor and Rock Creek as having a potential interest in acquiring the Purchased Assets.

---

[2] The description of the Sale Agreement in this motion is for summary purposes only.  In the event of a conflict between the terms of the Sale Agreement and the description in this motion, the terms of the Sale Agreement shall control.

[3] The Purchased Assets are set forth on Section 1.1 of the Sale Agreement.    Items excluded from the Sale are set forth in Section 1.2 of the Sale Agreement.

26. The Sale Agreement provides that within five (5) business days after the Effective Date, the Debtor will move the Court: (i) to enter the Bid Procedure Order; (ii) to schedule the Bid Procedures Motion for hearing within ten (10) days of the Effective Date; and (iii) to schedule a Sale Hearing no later than September 23, 2022.

27. The Sale of the Purchased Assets to the Buyer will be subject to objections, the opportunity for counteroffers, and approval of a break-up fee payable to the Buyer in the event of a consummated sale to a higher bidder.  The bidding procedures are detailed in the Bid Procedures Motion filed herewith and incorporated by reference.

## B.    Assumption and Assignment of Transferred Contracts.

28. The Buyer has identified on Schedule 1.4 to the Sale Agreement certain contracts and property rights that are part of the Sale.  The first two items on Schedule 1.4 constitute executory contracts (the "Transferred Contracts").  The remaining items on Schedule 1.4 consist of inventions which were previously assigned to the Debtor and which are proposed to be transferred to the Buyer as part of the sale.  These property rights do not constitute executory contracts. The Buyer is responsible for paying to the Debtor the cure costs and providing adequate assurance of future performance with respect to the Transferred Contracts.

## C.    Sale of the Purchased Assets Free and Clear.

29. The Sale Agreement provides that, pursuant to Section 363 of the Bankruptcy Code, all right, title and interest of the Debtor in and to and under the Purchased Assets shall be sold, transferred, conveyed, assigned, and delivered to the Buyer free and clear of all liens, claims, encumbrances, and interests.  Any perfected, enforceable, and valid liens, claims, encumbrances, and interests shall attach to the proceeds of the Sale in accordance with the priorities established under applicable law.

**RELIEF REQUESTED**

30. By this motion, the Debtor seeks authority to sell, subject to counteroffers, the Purchased Assets and to assume and assign to the Buyer the Transferred Contracts in accordance with Sections 363 and 365 of the Bankruptcy Code.  The Sale and related assumption and assignment of the Transferred Contracts is a reasonable exercise of the Debtor's business judgment and should be approved.

### A.   Approval of the Sale Is Necessary and Warranted.

31. The Bankruptcy Code provides that a debtor-in-possession "after notice and a hearing, may use, sell, or lease other than in the ordinary course of business, property of the estate." 11 U.S.C. §363(b)(1).  Bankruptcy courts have approved the disposition of a debtor's assets pursuant to Section 363(b) where the transactions represent the debtor's exercise of reasonable business judgment.   *See In re Martin*, 91 F.3d 389, 396 (3d Cir. 1996); *In re Lionel Corp.*, 722 F.2d 1063, 1070 (2d Cir. 1983); *see also Stephens Indus. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986); *In re Thomas McKinnon Securities, Inc.*, 120 B.R 301 (Bankr. S.D.N.Y. 1990); *In re Coastal Indus., Inc.*, 63 B.R 361,367 (Bankr. N.D. Ohio 1986); *In re Baldwin United Corp.*, 43 B.R 888 (Bankr. S.D. Ohio 1984).

32. The Debtor has concluded in its business judgment that the Sale of the Purchased Assets to the Buyer is necessary, is in the best interests of the Debtor's estate and its creditors, and will result in the best available recovery for the Purchased Assets.  The Debtor has limited funds, no income, and has a skeleton workforce requiring the prompt disposition of the Purchased Assets to maximize the recovery for creditors.

33. The Sale Agreement is the product of an extensive marketing effort and the result of an arms-length negotiation between the Buyer and the Debtor, with the assistance of Rock Creek.

8

The Purchase Price is expected to provide the estate with sufficient funds to pay in full the secured claim of Silicon Valley Bank by September 30, 2022 as required by the final cash collateral order, and to provide excess funds which, when coupled with the liquidation of other estate assets, should be sufficient to pay administrative expenses and for a recovery for prepetition creditors.

34. The Sale is subject to higher and better offers.  In the event that the successful bidder does not close the Sale within the time prescribed, the Debtor requests authority to sell the Purchased Assets to the second-highest bidder at the Auction, without further order of the Court.

35. Pursuant to the Sale Agreement and Section 363(f) of the Bankruptcy Code, the Debtor requests authority to sell the Purchased Assets free and clear of all liens, claims, encumbrances, and interests, with any perfected, enforceable, and valid liens and encumbrances attaching to the proceeds of the Sale in accordance with the priorities established under applicable law.  Section 363(f) of the Bankruptcy Code provides that the Debtor may sell property free and clear of liens, claims and encumbrances if one of the following conditions is satisfied:

  a.  Applicable non-bankruptcy law permits the sale of such property free and clear of such interest;

  b.  the lienholder or claimholder consents;

  c.  such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

  d.  such interest is in a bona fide dispute; or

  e.  the lienholder or claimholder could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest

36. The principal secured claim against the Debtor's assets is that of Silicon Valley Bank. The balance owed to SVB is approximately $1,400,000, and SVB asserts a lien upon the Debtor's tangible personal property and the proceeds of intellectual property.

37. Because the sale price is greater than the aggregate amount of the liens secured by the Purchased Assets, the Sale is permitted under 11 U.S.C. §363(f)(3).[4]

**B.      Authority to Assume and Assign Executory Contracts and Unexpired Leases**.

38. Subject to court approval, Section 365(a) of the Bankruptcy Code authorizes a debtor-in-possession to assume and assign or reject an executory contract or unexpired lease. *See* 11 U.S.C. § 365(a). The standard for determining whether an executory contract or unexpired lease should be assumed or rejected is the "business judgment" test. *See In re Orion Pictures Corp.*, 4 F.3d 1095, 1098 (2d Cir. 1993); *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984) (describing business judgment test as "traditional").

39. Upon finding that a debtor-in-possession has exercised sound business judgment in determining that the assumption or rejection is in the best interests of its estate, the court should approve the assumption or rejection under Section 365(a) of the Bankruptcy Code. *See, e.g., In re Child World, Inc.*, 142 B.R. 87, 89 (Bankr. S.D.N.Y. 1992); *In re TS Indus., Inc.*, 117 B.R. 682, 685 (Bankr. D. Utah 1990); *In re Del Grosso*, 115 B.R. 136, 138 (Bankr. N.D. Ill. 1990).

40. The Debtor requests the authority to assume and assign the Transferred Contracts only in the event that the Sale of the Purchased Assets closes. The Buyer shall be responsible for the payment of the cure costs in connection with the assumption and assignment of the Transferred Contracts.

## C.     <u>Good Faith Protections under Section 363(m)</u>

41. Because the Sale Agreement is the product of an arm's length transaction and the

Purchased Assets will be conveyed following notice and an opportunity for higher counteroffers,

the Buyer is entitled to the protections of  Section 363(m) of the Bankruptcy Code which

provides, in pertinent part

> The reversal or modification on appeal of an authorization under subsection
> (b)…of this section of a sale…of property does not affect the validity of a sale
> …under such authorization to an entity that purchased…such property in good
> faith, whether or not such entity knew of the pendency of the appeal, unless such
> authorization and such sale…were stayed pending appeal.

11 U.S.C. § 363(m).

42. Courts have defined a "good faith purchaser" as "one who buys property in good faith

and for value, without knowledge of adverse claims." *In re Mark Bell Furniture Warehouse,*

*Inc.*, 992 F.2d 7, 8 (1st Cir. 1993).   "Good faith" is a lack of "fraud, collusion…or an attempt to

take grossly unfair advantage of other bidders." *Id.*  (*citing In re Andy Frain Servs., Inc.*, 798

F.2d 1113, 1125 (7th Cir. 1986).  Due to the absence of a bright line test for good faith, the

determination is based on the facts of each case, concentrating on the "integrity of [an actor's]

conduct during the sale proceedings." *In re Tri-Cran, Inc.*, 98 B.R. 609, 618 (Bankr. D. Mass.

1989) (*quoting Rock Indus. Machinery Corp.*, 572 F.2d at 1198 (7th Cir. 1978))

<u>NOTICE</u>

43. The Debtor shall serve the Sale Notice in accordance with the Bid Procedures Order

upon the Office of the United States Trustee, counsel to the Buyer, all of the Debtor's creditors,

the Office of the Attorney General, all relevant taxing authorities, all known parties with an

---

[4] The Baldwin Companies has asserted a mechanic's lien against certain assets of the Debtor as a result of
services rendered at the Debtor's premises.  Such liens, to the extent valid and perfected, do not relate to
the Purchased Assets.

interest in acquiring the Purchased Assets, and all parties having filed a notice of appearance in

the Debtor's bankruptcy case.

**WHEREFORE**, the Debtor requests that the Court enter an Order:

A.    Approving this motion;

B.    Authorizing the Sale of the Purchased Assets pursuant to the Sale Agreement;

C.    Authorizing the Debtor to take the steps necessary to effectuate the Sale
      Agreement;

D.    Authorizing the Debtor to assume and assign to the Buyer the Transferred
      Contracts; and

E.    Granting the Debtor such other relief as is just and proper.


                                    Respectfully submitted,
                                    Genocea Biosciences, Inc.,
                                    By proposed counsel:


Dated: August 4, 2022               ___/s/ Andrew G. Lizotte_____
                                    Harold B. Murphy (BBO #326610)
                                    Andrew G. Lizotte (BBO #559609)
                                    MURPHY & KING, Professional Corporation
                                    28 State Street, Suite 3101
                                    Boston, MA 02109
                                    Tel: (617) 423-0400
                                    Email: ALizotte@murphyking.com


812048

# Exhibit A

*EXECUTION COPY*

ASSET PURCHASE AGREEMENT

dated as of August 2, 2022,

between

GENOCEA BIOSCIENCES, INC.

as Seller,

HARPY HOLDINGS, LLC

as Buyer

# TABLE OF CONTENTS

Page

1.  Purchase and Sale of the Purchased Assets. .......................................................................1
2.  Closing; Deliveries at Closing. ........................................................................................6
3.  Representations of Seller ..................................................................................................6
4.  Representations of Buyer ..................................................................................................8
5.  Conditions Precedent to the Obligations of Buyer ..........................................................10
6.  Conditions Precedent to Obligations of Seller ...............................................................11
7.  Covenants of the Parties. ................................................................................................12
8.  Conduct of Auction and Closing of the Sale...................................................................13
9.  Notices ...........................................................................................................................15
10. Termination....................................................................................................................16
11. Entire Agreement ...........................................................................................................16
12. Assignment.....................................................................................................................17
13. Governing Law; Bankruptcy Court Jurisdiction .............................................................17
14. No Third Party Beneficiaries ..........................................................................................17
15. No Liability of Officers and Directors.............................................................................17
16. Counterparts ...................................................................................................................17
17. Headings .........................................................................................................................17

List of Schedules

| | |
|---|---|
| Schedule 1.1.1 | Trademarks and Other IP |
| Schedule 1.1.2 | Patents |
| Schedule 1.1.4 | Licenses |
| Schedule 1.1.6 | Equipment |
| Schedule 1.4 | Contracts |

List of Exhibits

| | |
|---|---|
| Exhibit 1.4.1 | Joint Escrow Instructions |
| Exhibit 5.2 | Bill of Sale |
| Exhibit 5.3 | Assignment of Patents |
| Exhibit 5.4 | Assignment of Trademarks |
| Exhibit 5.5 | Assignment of Licenses |
| Exhibit 5.6 | Assignment of Contracts |

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "<u>Agreement</u>")[1] is made as of August 2, 2022 (the "<u>Effective Date</u>"), between Genocea Biosciences, Inc., a Delaware corporation ("<u>Seller</u>") and Harpy Holdings, LLC, a Delaware limited liability company ("<u>Harpy</u>"), for itself and for any affiliate that may be designated by Harpy to acquire the Purchased Assets at Closing ("<u>Buyer</u>").

WHEREAS, Seller has filed a petition under Title 11, United States Code (the "<u>Bankruptcy Code</u>") with the United States Bankruptcy Court for the District of Massachusetts (the "<u>Bankruptcy Court</u>") commencing a case under Chapter 11 of the Bankruptcy Code (the "<u>Bankruptcy Case</u>");

WHEREAS, Seller is the owner of intellectual property and rights to develop and commercialize the ATLAS platform (the "<u>Platform</u>"); and

WHEREAS, Buyer desires to purchase from Seller all of the assets of Seller related to the Platform free and clear of liens, claims, and encumbrances pursuant to section 363(f) of the Bankruptcy Code, all on the terms and subject to the conditions set forth in this Agreement;

WHEREAS, to induce the Buyer to enter into this Agreement and to consummate the transactions contemplated hereby, Seller has agreed to make certain representations, warranties, covenants and agreements set forth hereinafter.

NOW, THEREFORE, in consideration of these premises, the respective covenants of Buyer and Seller set forth below and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. <u>Purchase and Sale of the Purchased Assets</u>.

1.1. *Assets Being Sold to Buyer.*  Seller agrees to sell and assign to Buyer, and Buyer agrees to purchase at the Closing and thereafter as provided herein, all of Seller's rights, title and interests in, to and under the following assets other than Excluded Assets (collectively, the "<u>Purchased Assets</u>") as the same exist on the date hereof and on the Closing Date and any other delivery or assignment date.

1.1.1. All rights to the name "ATLAS" and "Inhibigens" as used in connection with the Platform, any and all registered and unregistered trademarks, and any other United States and foreign trademarks, trade names, service marks, trade dress, logos,

---

[1] Unless otherwise indicated, capitalized terms used but not yet defined shall have the meanings ascribed to them subsequently in this Agreement.

- 1 -

designs, brand names, and domain names and all related applications related to the Platform and the goodwill associated therewith listed on <u>Schedule 1.1.1</u> ("<u>Trademarks</u>");

1.1.2.   All United States and foreign patents and patent applications, whether issued, pending, expired, or abandoned, as well as all provisionals, continuations, continuations in part, divisionals, reissues, or reexaminations thereof or any related applications thereto related to the Platform listed on <u>Schedule 1.1.2</u> ("<u>Patents</u>");

1.1.3.   All registered and unregistered copyrights, computer programs, and computer software related to the Platform;

1.1.4.   All licenses under which Seller received rights to trademarks, patents and copyrights held by third-parties related to and utilized by Seller in the use of the Platform listed on <u>Schedule 1.1.4</u> (the "<u>Licenses</u>");

1.1.5.   All know-how, trade secrets, formulae, processes, and manufacturing know how, related to the Platform and its use for the identification of target antigens;

1.1.6.   Production or testing equipment related to the Platform which are enumerated on <u>Schedule 1.1.6</u> (the "<u>ATLAS Equipment</u>"), and all rights (but none of the liabilities or obligations) of Seller under or pursuant to all contracts under which Seller purchased the ATLAS Equipment;

1.1.7.   Files and file histories that are related to the Patents, Licenses, and Trademarks in Seller's possession or control and located with Seller's patent counsel;

1.1.8.   All data, reports, protocols, standard operating procedures, documentation, methods, models, screens, assays, pre-clinical and clinical trial data, data created with a view to producing registrations, chemical, pharmacological, toxicological, clinical, analytical, quality control, and safety data in Seller's possession or control related to the Platform, and, in the event (i) Buyer has elected to assume the Janssen Collaboration & Option Agreement as it may be amended on terms acceptable to Buyer in Buyer's sole discretion, or (ii) Janssen consents, all such materials generated in connection with or related to the Janssen Collaboration & Option Agreement;

1.1.9.   All documents (including a copy of the regulatory filing for GEN-009), files, clinical trial records, diagrams, specifications, designs, schematics, reports, records, laboratory notebooks, inventor assignments, patent and trademark applications, prosecution documents, manufacturing and other materials, packaging, commercial or other market information, chain of ownership, prototypes, test devices, models, or simulations in Seller's possession or control related to the Platform, which shall include all such materials generated in connection with or related to the Janssen Collaboration & Option Agreement in the event (i) Buyer has elected to assume the Janssen Collaboration & Option Agreement as it may be amended on terms acceptable to Buyer in its sole discretion, or (ii) Janssen consents;

- 2 -

1.1.10. Any and all good and usable inventory of Seller (whether raw materials, assay reagents, bacterial cell lines, work-in-process, or finished goods) related to the Platform, including without limitation the ATLAS antigen libraries generated in connection with or related to the Janssen Collaboration & Option Agreement and autoimmune disease, and libraries generated in connection with GEN-009 and GEN-011, together with related packaging materials, product samples, and all rights to acquire such inventory in the possession or control of third parties;

1.1.11. To the extent permitted by applicable law, all rights of Seller under any non-disclosure or confidentiality, non-compete, non-solicitation agreements, and other agreements with Seller's employees or former employees relating to the Purchased Assets and/or assignment to Seller of any rights relating to the Purchased Assets.

1.2.    *Excluded Assets.*  The Purchased Assets shall not include any other assets of Seller, including, but not limited to, the following (collectively, the "Excluded Assets"):

1.2.1.  All cash, cash equivalents, and securities on hand as of the Closing, wherever located, including, without limitation, in accounts, lock boxes, and other similar accounts (whether maintained at a bank, savings and loan, or other financial institution);

1.2.2.  All income tax refunds or other tax refunds, including, without limitation, accounts receivable relating to the Seller's rights under the Coronavirus Aid, Relief, and Economic Security Act;

1.2.3.  All claims or causes of action (including pursuant to §§ 542, 543, 544, 545, 547, 548, 549, 550, or 553 of the Bankruptcy Code);

1.2.4.  All accounts receivable (including accounts receivable related to the Platform), intercompany claims, general intangibles (except to the extent related solely to the Platform ), prepaid expenses, deposits, and other current assets of Seller;

1.2.5.  All contracts of Seller not included in the Purchased Assets listed above, including without limitation, the Janssen Collaboration & Option Agreement, *provided*, *however*, that Buyer reserves the right in its sole discretion, prior to the Objection Deadline (as defined in the Bidding Procedures Order), to add the Janssen Collaboration & Option Agreement, as it may be amended on terms acceptable to Buyer in its sole discretion, to the Contracts to be assumed and assigned to Buyer as part of the Purchased Assets, or to delete contracts from the Schedule of Contracts to be assumed; *provided*, *further*, that in the event Buyer enters into a separate agreement with the counterparty to the Janssen Collaboration & Option Agreement, Buyer shall use good faith efforts to induce such counterparty to waive any claim against Seller related to rejection of the Janssen Collaboration & Option Agreement;

1.2.6.  All insurance policies and related claims and all proceeds of insurance policies or related claims;

- 3 -

1.2.7.  All fixtures, furniture, and equipment, including office equipment, telephone systems and computers, furniture, fixtures and leasehold improvements, office supplies, and personal property not related to the Platform, and other physical assets of Seller not included in the ATLAS Equipment and not necessary in connection with the Platform; and

1.2.8.  All patents, patent applications, trademarks, compounds and compositions of matter solely related to GEN-003, GEN-004, GEN-007, GEN-009, and GEN-011.

1.3.   *No Assumption of Liabilities.*  Other than liabilities and obligations arising after Closing under the Licenses, Buyer shall not assume any claim, liability or obligation of Seller whatsoever, actual or contingent, known or unknown, direct or indirect (including without limitation under any third party beneficiary claim) whether or not any such liability or obligation pertains to the Purchased Assets, including, without limitation:

1.3.1.  liability for making payments of any kind to employees of or contractors to the Sellers or its affiliates (including, as a result of the transactions contemplated hereby, as a result of the termination of employment or contract by the Seller or its affiliates of employees or contractors, or as a result of union contracts, if any, grievances, or other labor claims, or otherwise);

1.3.2.  any liabilities resulting from or arising out of any violation of any environmental requirements by the Seller, its affiliates or anyone other than the Buyer or relating to the use, disposal or generation of hazardous materials by the Seller, its affiliates or anyone other than the Buyer or existence of any hazardous materials in the Purchased Assets or the properties or migration of such hazardous materials therefrom;

1.3.3.  liability for any violation or breach of any federal, state or local laws, regulations, orders or decision including, without limitation, any food, antitrust, drug or other health related laws, regulations or orders;

1.3.4.  liability for any transfer, income, franchise or similar tax, sales and use taxes or fees resulting from this Agreement or the transactions contemplated hereby;

1.3.5.  liability for other accrued or deferred and unpaid taxes, including, but not limited to, income, sales, real estate and personal property taxes and any interest and penalties with respect thereto;

1.3.6.  liability for payroll taxes for employees of the Seller or its affiliates;

1.3.7.  liability for making payments of any kind as a result of the termination of any agency relationship with any of the Seller or its affiliates;

1.3.8.  liability for pensions or other benefits to employees of the Seller or its affiliates;

- 4 -

1.3.9.  liability arising from inventories purchased hereunder, including, without limitation, for products or labeling or branding materials included as part of, or produced from such inventories;

1.3.10. liability for payment of accounts payable or other liabilities incurred by the Seller; and

1.3.11. any claim, liability or obligation with respect to any clinical trials conducted prior to the date hereof, including without limitation any product liability claims and/or any claims for death, injury or damages to properties.

1.4.    *Assignment of Contracts; Cure Amounts.*  At and with effect from Closing and pursuant to Section 365 of the Bankruptcy Code and the Sale Order, Seller shall assume and assign to Buyer the contracts of Seller set forth on Schedule 1.4 ("Contracts"), as such schedule may be amended in Buyer's sole discretion, including by deletion of contracts, prior to the Objection Deadline (as defined in the Bidding Procedures Order).  Seller shall use good-faith efforts to obtain Bankruptcy Court authority to assume and assign to Buyer the Contracts set forth in Schedule 1.4.  Buyer shall pay all Cure Costs under the Contracts or, in Buyer's sole discretion, Buyer may remove such Contracts from Schedule 1.4.

1.5.    *Purchase Price.*  The consideration to be paid at Closing by Buyer to Seller for the Purchased Assets shall be Two Million Dollars ($2,000,000) (the "Purchase Price").

1.5.1.  *Deposit.*  On the date hereof, Buyer shall make a cash deposit of $200,000 (the "Deposit") by wire transfer to Rock Creek Advisors, LLC ("Escrow Agent") to be held in a non-interest bearing escrow account in accordance with the joint escrow instructions attached hereto as Exhibit 1.5.1 and to be applied to the Purchase Price. Buyer and Seller consent to the terms of the joint escrow instructions and agree to be bound thereby.  If Buyer materially breaches this Agreement or terminates this Agreement other than as specified in Section 10, or if Buyer is unable to consummate the Transaction due to Buyer's inability to secure a loan or other financing for any reason other than a breach of any representation or covenant by Seller hereunder or failure of Seller to satisfy any of the other conditions precedent for Closing, Seller shall be entitled to retain the Deposit as liquidated damages and Seller's sole and exclusive remedy.  The Deposit will be refunded to the Buyer, in full, and Seller shall promptly (and in no event later than three business days after such termination) provide a joint written instruction to the Escrow Agent to release the Deposit to Buyer, if the purchase contemplated hereby is not consummated due to any of the following:  (i) the Seller shall fail to fulfill any of the conditions set forth in Section 5 hereof, (ii) the Sale Order shall not have been entered by the Termination Date (provided that the Buyer has elected to terminate this Agreement), or (iii) the transactions contemplated hereby are not consummated for any reason other than Seller's termination of this Agreement pursuant to Section 10.5 hereof.

1.5.2.  *Allocation of Purchase Price.*  The Purchase Price will be allocated to the Purchased Assets as reasonably determined by Buyer and Seller within 30 days after the

- 5 -

Closing Date.  Buyer and Seller agree that such allocation shall be binding for tax reporting purposes.

1.6.    *Further Assurances.*  Each of the parties hereto, before, at, and after the Closing, upon the request from time to time of the other party hereto and without further consideration, will do each and every reasonable act and thing as may be necessary or reasonably desirable to consummate the transactions contemplated hereby and to effect an orderly transfer to Buyer of the Purchased Assets, including without limitation:  executing, acknowledging, and delivering assurances, assignments, powers of attorney, and other documents and instruments; obtaining the approval of the Bankruptcy Court as promptly as practicable for the consummation of the transactions contemplated hereby; furnishing information and copies of documents, books, and records; filing reports, returns, applications, filings, and other documents and instruments with governmental authorities; in the case of Seller, transferring to Buyer patents, patent applications and the like held by Seller that relate to the Patents; turning over to Buyer all mail and communications in Seller's possession or control related to the Purchased Assets; and cooperating with the other party hereto (at such other party's expense) in exercising any right or pursuing any claim, whether by litigation or otherwise, other than rights and claims running against the party from whom or from which such cooperation is requested.  If either party shall receive any payment that pursuant to this Agreement is the property of the other party, then the party receiving such payment shall promptly turn such payment over to the other party and until such time shall hold it in trust for the other party.

2.    Closing; Deliveries at Closing.

2.1.    *Closing.*  The closing of the transactions (the "Transaction") contemplated hereby (the "Closing") shall be held remotely or at the offices of Ropes & Gray LLP, counsel to Seller, 800 Boylston Street, Boston, Massachusetts at 10:00 a.m., as the Seller and Buyer may mutually agree, on the third business day after the date of entry of the Sale Order or such other date as may be mutually satisfactory to the parties, subject to satisfaction or waiver of the conditions set forth in Sections 5 and 6 hereof (the date of the Closing being the "Closing Date").

2.2.    *Deliveries at Closing.*  At the Closing, assuming all conditions to Closing have been satisfied, (i) Buyer shall pay the Purchase Price minus the Deposit and shall instruct the Escrow Agent to release the Deposit to the Seller; and (ii) Seller shall deliver to Buyer a certified copy of the Sale Order, the instruments of conveyance specified in Section 5, and Seller shall make available all of the tangible Purchased Assets to Buyer at the present locations of such tangible Purchased Assets or at a centralized commercial location in Massachusetts to which such Purchased Assets are moved upon termination of Seller's lease.  Prior to Closing, Buyer shall be responsible for preparing the ATLAS Equipment for shipment and to pay all costs for shipment.  Buyer shall remove the ATLAS Equipment within seven (7) business days after the Closing.

3.    Representations of Seller.  Seller represents and warrants to Buyer, as of the Effective Date and the Closing Date, as follows:

- 6 -

3.1.   *Due Incorporation, Authorization, and Good Standing.*   Seller is a corporation duly incorporated, validly existing, and in good standing under the laws of the State of Delaware, and, subject to the approval of the Bankruptcy Court, has the requisite corporate power and authority to enter into, execute, deliver, and perform this Agreement, any other agreements relating to the transactions contemplated hereby, and any instruments of transfer and conveyance (collectively, with this Agreement, the "Transaction Documents") to which Seller is party, and to consummate all transactions contemplated hereby and thereby and has taken all corporate action required by law and its Restated Certificate of Organization and bylaws to authorize such execution, delivery, and performance.   This Agreement is, and each of the other Transaction Documents to which Seller is a party will, subject to the approval of the Bankruptcy Court and upon execution by a duly authorized officer of Seller at the Closing, be the valid and legally binding obligation of Seller, enforceable against Seller in accordance with its terms, subject to bankruptcy, insolvency, moratorium, reorganization, and similar laws of general applicability affecting the rights and remedies of creditors and to general principles of equity, regardless of whether enforcement is sought in proceedings in equity or at law

3.2.   *No Violation or Approval.*   The execution, delivery, and performance of this Agreement and the other Transaction Documents to which it will be a party and the consummation of the transactions contemplated hereby and thereby will not result in a breach or violation of, or a default under, any of the Licenses, Contracts, Seller's Restated Certificate of Incorporation, bylaws, any statute applicable to it, or any order, judgment, decree, rule, or regulation of any court or any governmental agency or body having jurisdiction over it or its properties.   Other than approval of the Bankruptcy Court and filings to be made on or after the Closing Date in connection with the Closing, no consent, approval, order, or authorization of, or declaration or filing with, any governmental authority is required of, and has not been obtained or made by, Seller in connection with the execution and delivery of this Agreement and the other Transaction Documents or the consummation of the transactions contemplated hereby and thereby.

3.3.   *Title to Purchased Assets; Condition of ATLAS Equipment.*   At the Closing, pursuant to the terms of the Sale Order, Seller will own and transfer to Buyer good title to the Purchased Assets, and at Closing, Buyer will be vested with good title to the Purchased Assets free and clear of all liens, claims, encumbrances, and interests.   Subject to Bankruptcy Court approval, Seller has the complete and unrestricted power and right to transfer the Purchased Assets to Buyer as contemplated by this Agreement.   To Seller's knowledge, except as disclosed on the attached Schedule 3.3, the ATLAS Equipment is in operating condition and free of material defects.

3.4.   *Brokers, Finders, Etc.*   Except for agreements with Rock Creek Advisors, LLC, Seller has not entered into any brokerage or other agreement contemplating commissions or other payments payable upon sale of the Purchased Assets.   All negotiations relating to this Agreement and the transactions contemplated hereby have been carried on without the intervention of any person acting on behalf of Seller in such manner as to give rise to any valid claim against Buyer for any brokerage or finder's commission, fee, or similar compensation.

- 7 -

The Seller and not the Buyer is solely responsible for paying any fee, commission or reimbursement to Rock Creek Advisors, LLC.

3.5.    *Intellectual Property.*

3.5.1.  Listed on <u>Schedule 1.1.1</u> are all of the Trademarks and Trademark applications owned by Seller related to the Platform that are registered, unregistered, pending, expired, or abandoned, with the U.S. Patent and Trademark Office and similar foreign offices. Also listed on Schedule 1.1.1 are all of the tradenames, service marks, copyrights, software, and domain names (collectively, "<u>Other IP</u>") owned by the Seller related to the Platform that, where applicable, are registered or otherwise recorded with the relevant authority or management entity (e.g., domain name registrar for domain names).

3.5.2.  Listed on <u>Schedule 1.1.2</u> are Patents and patent applications owned by Seller related to the Platform that are issued, pending, expired, or abandoned, with the U.S. Patent and Trademark Office and similar foreign offices.  Seller shall also provide to Buyer by no later than the Closing Date a list of the names and last known addresses, emails, and telephone numbers, to the extent known, for each of the inventors of the Patents and other individuals who, in Seller's determination, may have knowledge helpful to Buyer in the event that after Closing, Buyer discovers any breaks or discontinuations in title to any of the Patents or Trademarks and Buyer is required to remedy any such breaks or discontinuations.

3.5.3.  Seller exclusively owns (both legally and beneficially) all of the rights, title and interest in and to the Patents listed on <u>Schedule 1.1.2</u>  and the Trademarks and Other IP listed on Schedule 1.1.1.  The information concerning the Patents and the Trademarks and Other IP set forth in <u>Schedules 1.1.1</u> and <u>1.1.2</u> is complete and accurate in all material respects.  Except as set forth in <u>Schedule 1.1.1</u> or <u>1.1.2</u>, Seller has not granted any license, consent, permission or other right or privilege under Patents, Trademarks, or Other IP.  To Seller's knowledge, no employee of Seller or other person has claimed any ownership interest in any of the Patents, Trademarks, or Other IP included in the Purchased Assets.

3.5.4.  Buyer shall pay all fees payable and due as of Closing under or to maintain the Patents, Trademarks, and Other IP, included in the Purchased Assets, the information for which Seller shall provide to Buyer at least three (3) business days prior to Closing, up to a total of $5,000 in the aggregate. Seller shall pay at Closing, from the net proceeds of the Sale to Buyer, any fees due and payable as of Closing under or to maintain the Patents, Trademarks, and Other IP included in the Purchased Assets in excess of $5,000.

3.5.5.  To the knowledge of Seller, no person is infringing, misappropriated, or otherwise violated any of the Patents, Trademarks, Other IP, Licenses or Contracts included in the Purchased Assets.  To Seller's knowledge, the practice of any or all of the

- 8 -

inventions claimed in the Patents does not infringe or misappropriate the rights, patent or otherwise, of others.

3.6.    *Expiration of Representations and Warranties*. All representations and warranties of Seller shall expire on the Closing Date.

3.7.    *Disclaimer*.  Buyer acknowledges and agrees that, except as expressly provided herein, the sale of the Purchased Assets shall be "as is and where is" and Seller makes no, and hereby disclaims any, representation or warranty to Buyer with respect to the Purchased Assets or the Transaction contemplated hereby, including, without limitation, any warranty of merchantability or fitness for a particular purpose.  Without limiting the generality of the foregoing and except as set forth herein, Seller makes no representation or warranty, express or implied, as to the validity or utility of the Purchased Assets, the status of any issued patents or any applications for patents, whether transfer documentation executed by the Seller is sufficient to transfer title to the Patents registered in foreign jurisdictions, or whether the Patents or any usethereof infringes on the rights of others.  Further, there is no warranty as to the condition of any tangible assets constituting Purchased Assets.

4.    <u>Representations of Buyer</u>.  Buyer represents and warrants to Seller as follows:

4.1.    *Due Incorporation, Authorization, and Good Standing*.  Buyer is a limited liability company, duly organized and validly existing and in good standing under the laws of the State of Delaware, and has the requisite corporate power and authority to enter into, execute, deliver, and perform this Agreement and the other Transaction Documents to which Buyer is a party and to consummate all transactions contemplated hereby and thereby and has taken all action required by law and its [Certificate of Incorporation] and bylaws to authorize such execution, delivery, and performance.  This Agreement is, and each of the other Transaction Documents to which Buyer is a party, will, upon execution thereof by a duly authorized officer of Buyer at the Closing, be the valid and legally binding obligation of Buyer, enforceable in accordance with its terms, subject to bankruptcy, insolvency, moratorium, reorganization, and similar laws of general applicability affecting the rights and remedies of creditors and to general principles of equity, regardless of whether enforcement is sought in proceedings in equity or at law.

4.2.    *No Violation or Approval*.  The execution, delivery, and performance of this Agreement and the other Transaction Documents to which it will be a party and the consummation of the transactions contemplated hereby and thereby will not result in a breach or violation of, or a default under, Buyer's [Certificate of Incorporation], bylaws, any statute applicable to it, any agreement to which it is a party or by which it or any of its properties are bound, or any order, judgment, decree, rule, or regulation of any court or any governmental agency or body having jurisdiction over it or its properties.  No consent, approval, order, or authorization of, or declaration or filing with, any governmental authority or other entity is required of, and has not been obtained or made by, Buyer in connection with the execution and delivery of this Agreement and the other Transaction Documents or the consummation of the transactions contemplated hereby and thereby.

- 9 -

4.3.    *Brokers, Finders, etc.*    All negotiations relating to this Agreement and the transactions contemplated hereby have been carried on without the intervention of any person acting on behalf of Buyer in such manner as to give rise to any valid claim against Seller or Buyer for any brokerage or finder's commission, fee, or similar compensation.

4.4.    *Expiration of Representations and Warranties.* All representations and warranties of Buyer shall expire on the Closing Date.

5.    <u>Conditions Precedent to the Obligations of Buyer</u>.    The obligations of Buyer to purchase the Purchased Assets and to consummate the other transactions contemplated hereby and by the other Transaction Documents are subject to the satisfaction on or prior to the Closing Date of each of the following conditions, unless expressly waived by Buyer at the Closing:

5.1.    *Representations and Warranties.*    The representations and warranties made by Seller in this Agreement (including the Exhibits and Schedules hereto), shall be true and correct in all material respects as of the Closing Date as if made on and as of the Closing Date.

5.2.    *Bill of Sale.*    Seller shall have executed and delivered a bill of sale ("<u>Bill of Sale</u>") in the form attached hereto as <u>Exhibit 5.2</u> conveying to Buyer all of the Purchased Assets as of the Closing Date.

5.3.    *Patents*.    Seller shall have executed and delivered to Buyer an Assignment of Patents in the form attached hereto as <u>Exhibit 5.3</u> assigning the Patents to Buyer.

5.4.    *Trademarks.*    Seller shall have executed and delivered to Buyer an Assignment of Trademarks in the form attached hereto as Exhibit 5.4 assigning the Trademarks to Buyer.

5.5.    *Licenses.*    Seller shall have executed and delivered to Buyer an Assignment of Licenses in the form attached hereto as Exhibit 5.5 assigning the Licenses to Buyer.

5.6.    *Contracts.*    Seller shall have executed and delivered to Buyer an assignment of all of the Contracts in the form attached hereto as Exhibit 5.6.

5.7.    *Bidding Procedures Order.*    The Bankruptcy Court shall have held a hearing (the "<u>Bidding Procedures Hearing</u>") and shall have entered an order in the Bankruptcy Case approving procedures for solicitation and consideration by the Bankruptcy Court of bids from third parties for the Purchased Assets (the "<u>Bidding Procedures Order</u>"), which Bidding Procedures Order shall be in form and substance reasonably satisfactory to both Seller and Buyer and shall provide that:

5.7.1.    in the event that the Bankruptcy Court fails to approve a sale to Buyer as provided hereunder and instead approves a sale of the Purchased Assets to an entity that has submitted a Counteroffer, and such sale closes, Seller shall pay to Buyer from the purchase price to be paid to Seller, without further order of the Bankruptcy Court,

- 10 -

$100,000 for Buyer's break-up fee and expenses incurred in connection with the Transaction;

5.7.2.  Seller may not modify the bidding procedures approved by the Bankruptcy Court without further order of the Bankruptcy Court.

5.8.  *Notice of Sale.*  Seller shall have served a copy of a notice of the sale upon (i) all creditors and all other persons who are parties in interest in the Bankruptcy Case, (ii) all persons with security interests, liens or other interests in any of the Purchased Assets, and (iii) all other persons required to receive notice of the sale pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  Seller shall have filed a certificate of such service (the "Certificate of Service") with the Bankruptcy Court in the Bankruptcy Case.

5.9.  *Sale Order.*  The Bankruptcy Court shall have entered an order in the Bankruptcy Case in form and substance reasonably satisfactory to both Seller and Buyer:  (i) approving the sale, transfer, assignment, and assumption, as appropriate, of the Purchased Assets to Buyer upon the terms and conditions set forth herein, free and clear of any and all liens, claims, encumbrances, and interests of any kind or nature whatsoever; (ii) providing that any and all valid liens, claims, and encumbrances shall attach to the Purchase Price at Closing; and (iii) containing findings that all applicable notice and hearing requirements for the Transaction under the Bankruptcy Code, Bankruptcy Rules, and any local rules of the Bankruptcy Court have been satisfied, the Transaction is in the best interests of Seller's estate and creditors in the Bankruptcy Cases, and, conditioned on Buyer's cooperation with Seller in obtaining a good faith finding, Buyer is a good faith purchaser pursuant to Section 363(m) of the Bankruptcy Code (the "Sale Order").

5.10.  *Final Orders.*  On the Closing Date, the Sale Order shall have become a Final Order, which has not been rescinded stayed or vacated, and which is in full force and effect.  The term "Final Order" as used in this Agreement shall mean an order, judgment or other decree, the operation or effect of which has not been reversed, stayed, modified or amended.

5.11.  *Certified Copies.*  There shall have been delivered to Buyer a certified copy of the Sale Order and the Certificate of Service entered or filed in the Bankruptcy Case as well as a certified copy of the docket of the Bankruptcy Case evidencing entry of the Sale Order.

5.12.  *General.*  Buyer shall have received counterpart originals, or certified or other copies, of all documents, including without limitation records of corporate proceedings, that it may reasonably request in connection therewith.

6.  Conditions Precedent to Obligations of Seller.  Seller's obligations to sell the Purchased Assets to Buyer and to consummate the other transactions contemplated hereby and by the other Transaction Documents are subject to the satisfaction on or prior to the Closing Date of each of the following conditions, unless expressly waived by Seller at or prior to the Closing:

- 11 -

6.1.    *Representations and Warranties.*  The representations and warranties made by Buyer in this Agreement, except for those specifically made as of a particular date, shall be true and correct in all material respects as of the Closing Date.

6.2.    *Payment Acknowledgment.*  Buyer shall have paid the Purchase Price.

6.3.    *Bankruptcy Court Approval.*  The Bankruptcy Court shall have entered the Sale Order and such order shall not have been rescinded, reversed, modified, or stayed, and shall be in full force and effect.

7.    Covenants of the Parties.

7.1.    *Access to Information, and Contracting Parties.*  From and after the date hereof, through the Closing Date, Seller will permit Buyer and its authorized representatives to have reasonable access during normal operating hours to records in possession of Seller that reasonably relate to the Platform.  In addition, prior to or after the Closing Date, Seller will permit authorized representatives and professionals of Buyer reasonable access during normal operating hours to all management personnel and books and records of Seller related to the Platform , and Buyer shall (at its expense) be permitted to make abstracts from, or copies of, all such books and records.  Seller shall reasonably cooperate with Buyer to assist Buyer to contact counterparties to Seller's material contracts related to the Platform, including manufacturers, packagers, and licensors.

7.2.    *Preservation of Purchased Assets Prior to Transfer of Purchased Assets.*  Prior to the transfer of the Purchased Assets to Buyer, Seller will not (a) license, sell, or lease any Purchased Asset to any person or entity, or (b) amend, terminate, or modify any material licenses, registrations, or applications of or related to the Patents or the Platform.

7.3.    *Confidential Information.*

7.3.1.    Each party agrees that it will treat in confidence all documents, materials, and other information obtained (whether obtained before or after the date of this Agreement and whether or not in tangible form) regarding the other party during the course of the negotiations of the transactions contemplated hereby and the preparation of this Agreement, the Transaction Documents, and other related documents ("Confidential Information").  Confidential Information shall not be communicated to any third person (other than to each party's respective counsel, accountants, financial advisors, and investors or potential investors and other necessary parties on a "need to know" basis only).  No party shall use any Confidential Information in any manner whatsoever except for the negotiations of the transactions contemplated hereby and the purposes of this Agreement and related transactions with potential lenders and investors; *provided*, *however*, that (a) the parties may disclose this Agreement and its terms as necessary to file the Sale Motion and related motions, to comply with the Bidding Procedures Order, the Sale Order, and related orders, and to market the Purchased Assets to other bidders, and (b) after the Closing, Buyer may

- 12 -

use or disclose any Confidential Information included in the Purchased Assets without any such restrictions.  In the event that the transactions contemplated hereby are not consummated, each party will return all copies of Confidential Information to the other party and the obligation to protect Confidential Information as set forth herein shall expire two (2) years from the date thereof.  Notwithstanding the foregoing, the obligation of each party to treat Confidential Information in confidence shall not include any information which (a) is or becomes available to such party from a source other than the other party, which source is not otherwise bound by a confidentiality obligation; (b) is or becomes available to the public other than as a result of disclosure by such party or its agents; or (c) upon advice of counsel, is required to be disclosed under applicable law (including, without limitation, the Bankruptcy Code) or judicial process, but only to the extent it must be disclosed.

7.3.2.  If the transactions contemplated hereby are consummated, (i) all Confidential Information relating to the Purchased Assets shall be deemed to be information received in confidence from Buyer, and not to already have been known by Seller, for purposes of this Section 7.3 and shall be held in confidence by Seller and its affiliates after the Closing Date pursuant to the requirements set forth in Section 7.3.1, and (ii) all Confidential Information relating in part to the Purchased Assets shall not be used by Seller or its affiliates to the detriment of Buyer and shall be maintained in confidence after the Closing Date by Seller and its affiliates in the same manner as Seller and its affiliates treat their other confidential information.

7.3.3.  Buyer agrees that, prior to the Closing, without the prior written consent of Seller, Buyer will not, directly or through one or more agents, enter into any agreement, arrangement, or understanding with respect to the Purchased Assets with any person (i) whom the Buyer is aware has entered into a confidentiality agreement with Seller in respect of possible acquisition of a material part of the Purchased Assets within the past six months or (ii) has expressed an intention in writing to the Buyer that it intends to be a bidder for a material part of the Purchased Assets.

7.4.    *No Public Announcement*.  Except as provided herein, neither Seller nor Buyer shall, without the approval of the other, make any press release or other public announcement regarding the transactions contemplated by this Agreement, except as and to the extent that any such party is so obligated by applicable law, in which case the other party shall be advised and the parties shall use their best efforts to cause a mutually agreeable release or announcement to be issued; *provided* that the foregoing shall not preclude communications or disclosures necessary to (i) implement the provisions of this Agreement; or (ii) comply with accounting obligations or applicable law (including, without limitation, the Bankruptcy Code) or judicial process.  Upon closing of the transactions hereunder, Buyer shall have the right to issue a press release, which in form and substance shall be reasonably acceptable to the Seller.

8.    Conduct of Auction and Closing of Sale.

8.1.    *Sale Hearing, Competing Bids, Etc*.

- 13 -

8.1.1. Buyer acknowledges that in connection with the sale of the Purchased Assets, the sale shall be noticed as required by the Bankruptcy Code and as shall be directed by the Bankruptcy Court in the Bidding Procedures Order, that the Purchased Assets are for sale and will be sold to the highest or best bidder at a hearing to be conducted in the Bankruptcy Case (the "Sale Hearing"). Buyer shall be entitled to submit further bids at or before the Sale Hearing, consistent with the Bidding Procedures Order, in the event that a higher or better offer than that reflected herein is received by Seller. In the event that the highest or best offer, as determined by the Bankruptcy Court, is submitted at or before the Sale Hearing by a purchaser other than Buyer, then Seller shall be entitled to close a sale pursuant to such other offer (or, if such other offer does not close, then pursuant to the next highest or best offer) and, upon such closing, this Agreement shall be considered null and void; *provided* that the Deposit shall remain in escrow until the earlier of ten business days after the Sale Hearing and, if such other sale or sales do not close, Seller may close a sale to Buyer on the terms hereof as modified by any higher offer submitted by Buyer at the Sale Hearing.

8.1.2. Any counteroffer or bid for any of the Purchased Assets (a "Counteroffer") shall comply with all of the following requirements, provided that Seller may waive any requirements other than requirements specified in Section 5.6 hereof. Any such bid shall be:

8.1.2.1. delivered to counsel for Seller, James M. Wilton, Ropes & Gray LLP, 800 Boylston Street, Boston, MA 02199-3600, e-mail: james.wilton@ropesgray.com so that it is actually received on or before 12:00 noon on the [fifth to last business day prior to the scheduled date of the Sale Hearing];

8.1.2.2. accompanied by (a) a cash deposit with counsel to Seller (to be received on or before the last business day prior to the scheduled date of the Sale Hearing) equal to $200,000, and (b) a duly executed, signed, detailed asset purchase agreement on terms in aggregate not materially more burdensome to Seller than provisions contained herein (as determined by Seller in its sole discretion exercised in good faith); and

8.1.2.3. accompanied by evidence satisfactory to Seller of such bidder's financial ability to consummate the transaction on the date and on the terms contemplated by the asset purchase agreement submitted with such bid in the form of audited or unaudited financial statements, bank statements, or other evidence.

8.2. *Seller's Motions in Bankruptcy Court.* Within five (5) business days after the Effective Date, Seller will move the Bankruptcy Court (i) to enter the Sale Order and the Bidding Procedures Order, (ii) to schedule the Bidding Procedures Hearing on a date no later than ten

- 14 -

(10) days after the Effective Date, and (iii) to schedule the Sale Hearing on a date no later than September 23, 2022.

      8.3.    *Preparation for Closing.*  Each of the parties hereto agrees to use its reasonable and good faith efforts to bring about the fulfillment of the conditions precedent contained in this Agreement, including without limitation the obtaining of all necessary consents, approvals, and waivers for the consummation of the transactions contemplated by this Agreement.

      8.4.    *Cooperation.*  Buyer and Seller agree to cooperate with one another in good faith with respect to any discussions Buyer may have with any customers, landlords, vendors, former employees, or others having (or formerly having) business relationships with Seller with respect to the Platform.

      9.    <u>Notices</u>.  All notices, demands, consents or other communications which any party may be required or may desire to give under this Agreement shall be in writing and shall be deemed to have been duly given (i) upon receipt if mailed by certified mail, return receipt requested, postage prepaid, (ii) one business day after prepaid deposit with a reputable overnight delivery service, or (iii) upon receipt if delivered by telecopy or email, the receipt of confirmation by sender being conclusive evidence of such receipt, in any case to the party to whom the same is so given or made at the address of such party as set forth below:

| | |
|---|---|
| To Seller: | Genocea Biosciences, Inc. |
| | c/o Rock Creek Advisors, LLC |
| | 555 Fifth Ave 14th Floor |
| | New York, NY 10017 |
| | Email: JGansman@RockcreekFA.com |
| | Attn:  Jim Gansman |
| | |
| with a copy to: | Ropes & Gray LLP |
| | 800 Boylston Street |
| | Boston, MA  02199-3600 |
| | Telecopier:  (617) 951-7050 |
| | Email: james.wilton@ropesgray.com |
| | Attn:  James M. Wilton, Esq. |
| | |
| To Buyer: | Harpy Holdings, LLC |
| | Telecopier:  (858) 550-2092 |
| | Email: rbernard@ichorms.com |
| | Attn:  Robert Bernard, President |
| | |
| with a copy to: | Cole Schotz P.C. |
| | 300 E. Lombard Street, Suite 1800 |
| | Baltimore, MD 21202 |
| | Fax: 410-528-9400 |
| | Email: iwalker@coleschotz.com |

- 15 -

Attention: Irving E. Walker, Esq.

To Escrow Agent:      Rock Creek Advisors, LLC
555 Fifth Ave 14th Floor
New York, NY 10017
Email: JGansman@RockcreekFA.com
Attn: Jim Gansman

10.    <u>Termination</u>.  This Agreement may be terminated (the date of such termination, the "<u>Termination Date</u>") by Buyer or Seller by giving written notice to the other party as follows:

10.1.    by Buyer at any time after three (3) business days following the Effective Date, if Seller has not filed the motion to approve the Sale Order (the "<u>Sale Motion</u>") with the Bankruptcy Court on or before such date;

10.2.    by Buyer at any time after ten (10) days following the Effective Date, if the Bidding Procedures Order is not entered on or before such date;

10.3.    by Buyer at any time after September 23, 2022, if the Sale Order has not been entered on or before such date in favor of the sale to the Buyer (as highest bidder or backup bidder);

10.4.    by Buyer at any time after five business days following the entry of the Sale Order, if the Closing has not occurred for any reason other than Buyer's material breach of its obligations hereunder (unless the Seller is also in material breach of its obligations hereunder), including, without limitation, any failure to satisfy the closing conditions under Section 5;

10.5.    by Seller or Buyer if the Closing has not occurred as a result of Buyer's or Seller's material breach of its obligations hereunder, respectively;

10.6.    by Seller, if Buyer is not the successful bidder at the Sale Hearing under and pursuant to Section 8; or

10.7    by mutual written consent of Seller and Buyer.

In the event of termination by Buyer pursuant to this Section 10, the Escrow Agent shall promptly refund to Buyer by wire transfer the Deposit and all of Buyer's obligations under this Agreement shall be terminated.  In the event of termination by Seller pursuant to this Section 10, Seller's sole and exclusive remedy shall be retention of the Deposit, as liquidated damages, and Buyer shall have no liability of any kind to Seller under this Agreement.

11.    <u>Risk of Loss</u>.  The risk of loss or damage to the Purchased Assets shall be upon the Seller at all times prior to the Closing.

12.    <u>Entire Agreement</u>.  The agreement of the parties that is comprised of this Agreement, the Exhibits and Schedules hereto, and the other documents referred to herein sets

- 16 -

forth the entire agreement and understanding between the parties and supersedes any prior written agreement or understanding and any prior or contemporaneous oral agreement or undertaking relating to the subject matter of this Agreement.  This Agreement may not be amended or modified except by a written agreement duly executed by each of the parties hereto.

13.    Assignment.  This Agreement shall be binding upon and inure to the benefit of and be enforceable by the successors and permissible assigns of Seller and Buyer, including any successor trustee appointed in the Bankruptcy Case.  This Agreement and any rights hereunder shall not be assigned or transferred by any party hereto without the prior written consent of the other party, *provided* that Buyer may assign its rights hereunder to a subsidiary or affiliate, *provided* that no assignment by Buyer shall relieve Buyer of its obligations hereunder.

14.    Governing Law; Bankruptcy Court Jurisdiction.    This Agreement shall be governed by and construed in accordance with the law of the Commonwealth of Massachusetts, without giving effect to any choice or conflict of law provision or rule that would cause the application of the law of any other jurisdiction.  The parties agree that the Bankruptcy Court shall retain jurisdiction to enforce the provisions of this Agreement, the Bidding Procedures Order and the Sale Order.

15.    No Third Party Beneficiaries.  Nothing in this Agreement is intended or shall be construed to give any person or entity, other than the parties hereto, any legal or equitable right, remedy, or claim under or in respect of this Agreement, the Bidding Procedures Order, and the Sale Order or any provision contained herein or in any schedule or exhibit attached hereto.

16.    No Liability of Officers and Directors.  The parties hereto acknowledge and agree that any individual executing this Agreement or any certificates or other documents contemplated by this Agreement on behalf of Buyer or Seller do so on behalf of such entities and not in their individual capacities.  As such, no officer, director, employee, or agent of Buyer or Seller shall have any liability hereunder.

17.    Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original for all purposes and all of which together shall constitute one and the same instrument.

18.    Headings.  The headings contained in this Agreement are inserted only as a matter of convenience and for reference and in no way define, limit, or describe the scope or intent of this Agreement.

127810632_8
45678/0002-43547096v2

IN WITNESS WHEREOF, Seller and Buyer have caused this Agreement to be executed under seal by their respective duly authorized officers as of the day and year first written above.

GENOCEA BIOSCIENCES, INC.

By:_____
     Name:     William Clark
     Title:     Chief Executive Officer

*Signature Page to Asset Purchase Agreement*

HARPY HOLDINGS, LLC

By: _____

    Name:  Robert Bernard
    Title:   Authorized Representative

*Signature Page to Asset Purchase Agreement*

## Schedule 1.1.1

## Trademarks and Other IP

Updated July 29, 2022

Registered Marks:

- GENOCEA (word only)
    o Int'l Class 5:  Vaccines
    o Int'l Class 42:  Research and development of vaccines
    o Service Mark Registration No. 4,801,942 (September 1, 2015)
    o First use/in commerce August 2012
    o US Application Serial No. 86/181,328
    o WIPO Madrid Protocol Registration No. 1 218 398 (June 18, 2014) for AU, CN, CTM (EU), IN, IL, JP, MX, NZ, NO, KR, RU, SG, CH, TR; and foreign applications/registrations under Paris Convention for AR, BR, CA, ID, MY, TH, VZ, ZA

- INHIBIGEN (word only)
    o Int'l Class 5:  Vaccines; Int'l Class 44:  Immunotherapies, Cell Therapies
    o US Application Serial No. 88/797,352, filed Feb 14, 2020 initially for Class 5 only; Class 44 added in prosecution
    o WIPO Madrid Protocol Registration No. 1 564 964 (July 28, 2020) for CN, CTM (EU), JP (for Class 5 and Class 44)
    o EU grant of protection in Classes 5 and 44 (to July 28, 2030)
    o CN grant of protection in Classes 5 and 44 (to July 28, 2030)
    o Proof of use provided for INHIBIGENS, not INHIBIGEN.  US strategy shifted to Supplemental Register, modifying to INHIBIGENS; WIPO application invalid due to now-improper antecedent in US

- INHIBIGENS (word only)
    o Int'l Class 44 only:  Immunotherapies, Cell Therapies (specifically: *"Medical treatment of cancer, infectious disease, immune system-related diseases and disorder, and pathogen-induced diseases and disorders, namely immunotherapies; antigen-directed cell therapy services"*)
    o Supplemental Register:  US Service Mark Registration 6398491 (June 22, 2021)
        ▪ Declaration of Use due June 22, 2027
        ▪ 10-year term to June 22, 2031
    o WIPO Madrid Protocol Registration No. 1 623 298 (Sept 30, 2021) for CN, CTM (EU), JP, UK
        ▪ 10-year term to Sept 30, 2031

Unregistered Marks:   ATLAS<sup>TM</sup> and Genocea logo

Registered Copyrights:  None

1

<u>Registered Software</u>:   None

<u>Unregistered Software</u>:
- PASS
  - Uses no open source software (only Microsoft proprietary tools)
- BioInformatics Pipeline
  - Uses open source software Python (under GNU General Public License)

<u>Trade Secrets</u>:   Certain aspects of PASS software; certain aspects of ATLAS-based antigen selection.

<u>Domain Names</u>:
- Via Boston Website Hosting


Renew on 5/3/2023 and 5/4/2023:
  - Genocea.com, .net, .org
  - Genoceabio.com, .net, .org
  - Genoceabiosciences.com, .net, .org


Renew on 12/2/2022:
  - Targetsmatter.com, .net, .org


Renew on 2/1/2023, 2/3/2023, 2/4/2023:
  - Genoceabioscience.com, .net, .org
  - Genoceavax.com, .net, .org
  - Genoceavaccines.com, .net, .org
  - Genoceavaccine.com, .net, .org
  - Genoceapharma.com, .net, .org
  - Genoceainc.com, .net, .org
  - Genoceallc.com, .net, .org
  - Genoceacorp.com, .net, .org
  - Egenocea.com, .net, .org
  - Genoceaonline.com, .net, .org
  - Genoceaproducts.com, .net, .org
  - igenocea.com, .net, .org

2

**Schedule 1.1.2**

**Patents**

Updated July 29, 2022

Patents and Patent Applications I:  Antigen Discovery Platform (ATLAS[TM])

| TITLE | INVENTORS (ASSIGNEE) | APP TYPE | SERIAL NO. FILING DATE | STATUS ISSUE, PUB'N, 30 MONTH NAT'L PHASE DATES |
|---|---|---|---|---|
| *ANTIGEN DISCOVERY PLATFORM 003:  GENOCEA-OWNED* | | | | |
| ANTIGEN SCREENING SYSTEM<br><br>*(aka ATLAS[TM])* | Flechtner Gierahn<br><br>(Genocea) | PROV 1 | US 61/077,323<br>July 1, 2008 | Converted |
| | | PAR | US 12/496,171<br>July 1, 2009<br><br>*[basic method of ID'ing an antigen]* | **Issued US Patent 8,313,894 November 20, 2012**<br><br>*(expires August 20, 2030, incl. 415 days of PTA)*<br><br>Published:<br>US 2010/0048418<br>February 25, 2010 |
| | | CONT 1 | US 13/627,332<br>[September 26, 2012]<br><br>*[method of evaluating an immune response of a human subject]* | **Issued US Patent 9,045,791 June 2, 2015**<br><br>*(expires Aug 23, 2029, incl. 53 days of PTA)*<br><br>Published<br>US 2013/0102496<br>April 25, 2013 |
| | | CONT 2 | US 14/700,573<br>[April 30, 2015]<br><br>*[method of ID'ing a cancer or tumor antigen]* | **Issued US Patent 9,873,870 Jan 23, 2018**<br><br>*(expires July 1, 2029; no PTA, terminal disclaimer against PAR)*<br><br>Published:<br>US 2016/0083717<br>March 24, 2016 |
| | | DIV 1 | US 15/846,602<br>[December 19, 2017]<br><br>*[method of ID'ing an autoimmune antigen]* | **Issued US Patent 10,570,387 Feb 25, 2020**<br><br>*(expires July 1, 2029; no PTA)*<br><br>Published:<br>US 2018/0362966<br>December 20, 2018 |
| | | DIV 2 | US 16/744,690<br>[January 16, 2020]<br><br>*[method of identifying infection/latent infection/exposure/coloniz ation/clearance by an infectious agent]* | **Issued US Patent 11,162,093 Nov 2, 2021**<br><br>*(expires July 1, 2029; no PTA)*<br><br>Published:<br>US 2020/0385703<br>December 10, 2020 |

3

| | | CONT 3 | US 17/490,966 [Sept 30, 2021] | Abandoned |
|---|---|---|---|---|
| | | PCT 1 | PCT/US2009/049406 July 1, 2009 | Nationalized Published: WO 2010/002993 January 7, 2010 30 Month Nat'l Phase: January 3, 2011 |
| | | | AU 2009266924 | **Granted AU Patent No. 2009-266924** |
| | | | AU DIV 1 2016201551 [March 10, 2016] | **Granted AU Patent No. 2016-201551** |
| | | | CA 2728927 | **Granted CA Patent No. 2728927** |
| | | | CA DIV 1 2987102 [December 19, 2017] | Allowed to lapse Nov 27, 2019 |
| | | | EP 09774443.7 | **Granted EP Patent No. 2300828** Validated: BE, CH, DE, FR, GB, IE, NL, SE |
| | | | EP DIV 1 18180546.6 [June 28, 2018] | **Granted EP Patent No. 3413049 [Oct 28, 2020]** Validated: BE, CH, DE, FR, GB, IE, NL, SE, SP, IT, AT |
| | | | EP DIV 2 202002884.1 [Oct 28, 2020] | Pending Published: EP 3,839,512 June 23, 2021 |

Patents and Patent Applications II:  Inhibigens

| TITLE | INVENTORS (ASSIGNEE) | APP TYPE | SERIAL NO. FILING DATE | STATUS ISSUE, PUB'N, 30 MONTH NAT'L PHASE DATES |
|---|---|---|---|---|
| *INHIBIGENS, OTHER IO:  GENOCEA-OWNED* | | | | |
| **GEN-IO-001 family:  ANTIGEN SELECTION / DESELECTION** | | | | |
| TREATMENT METHODS *(aka Inhibigen Selection and Deselection; IO Foundational)* *Selection and deselection of stimulatory antigens and inhibigens; also TAAs; for oncology.* | Flechtner Lossky-Elias Carroll Lam McNeil Broom (Genocea) | PROV 1 | US 62/473,899 March 20, 2017 | Converted |
| | | PROV 2 | US 62/484,258 April 11, 2017 | Converted |
| | | PROV 3 | US 62/583,233 November 8, 2017 | Converted |
| | | PAR | US 15/927,067 March 20, 2018 | **Issued US Patent 10,859,566 December 8, 2020 + Certificate of Correction [Nov 2, 2021]** *(expires Mar 20, 2038; no PTA)* Published: US 2019/0072543 March 7, 2019 |

128335387_7

| | | DIV 1 | US 17/085,027<br>October 30, 2020 | Pending<br><br>Published:<br>US 2021/0199644<br>July 1, 2021 |
|---|---|---|---|---|
| | | PCT | PCT/US2018/023442<br>March 20, 2018 | Nationalized<br><br>Published:<br>WO 2018/175505<br>September 27, 2018<br><br>30-month Nat'l Phase:<br>September 20, 2019 |
| | | | AU 2018240199 | Pending |
| | | | BR 112019019407-0 | Pending |
| | | | CA 3,055,791 | Pending |
| | | | CN 201880033153.2 | Pending |
| | | | EP 18770807.8 | Pending<br><br>EPO Pub No. 3601536<br>February 5, 2020 |
| | | | IN 201917042566 | Pending |
| | | | IL 269371 | Pending |
| | | | JP 2019-551443 | Pending<br><br>JP Pub 2020-514378<br>May 21, 2020 |
| | | | KR 10-2019-7030751 | Pending |
| | | | MX/a/2019/011148 | Pending |
| | | | SG 11201908530Q | Pending |
| **GEN-IO-002 family: IA VAX** | | | | |
| TREATMENT METHODS<br><br>*(aka Inhibigen VAX)*<br><br>*Conversion of inhibigens to stimulatory antigens by various methods, eg inclusion of a different adjuvant. Not specific to oncology.* | Flechtner<br>Lossky-Elias<br>Carroll<br>Lam<br>McNeil<br>Broom<br><br>(Genocea) | PROV 1 | US 62/737,832<br>September 27, 2018 | Converted |
| | | PROV 2 | US 62/757,915<br>November 9, 2018 | Converted |
| | | PCT | PCT/US2019/053672<br>September 27, 2019 | Nationalized<br><br>Published:<br>WO 2020/069454<br>Apr 2, 2020<br><br>30-month Nat'l Phase:<br>March 27, 2021 |
| | | | US 17/280,594 | Pending |
| | | | AU 2019351274 | Pending |
| | | | BR 112021005221-6 | Pending |
| | | | CA 3,114,585 | Pending |
| | | | CN 201980077612.1 | Pending |
| | | | CO NC2021/0005234 | Pending |
| | | | EP 19866699.2 | Pending |

128335387_7

| | | | | Published: EP 3856241 Aug 4, 2021 |
|---|---|---|---|---|
| | | | EA (Eurasia) 202190856 | Pending |
| | | | HK via EP 62022047507.8 | Registered |
| | | | IL 281839 | Pending |
| | | | IN 20211708683 | Pending |
| | | | JP 2021-517302 | Pending |
| | | | KR 10-2021-7012738 | Pending |
| | | | MX/a/2021/003265 | Pending |
| | | | SG 11202102827Y | Pending |
| **GEN-IO-003 family:  IA ACT** | | | | |
| TREATMENT METHODS  *(aka Inhibigen ACT)*  *Re-education of T cells responsive to inhibigens. For oncology.* | Flechtner Lossky-Elias Carroll Lam McNeil Broom  (Genocea) | PROV 1 | US 62/737,862 September 27, 2018 | Converted |
| | | PCT | PCT/US2019/053669 September 27, 2019 | Nationalized  Published: WO 2020/069452 Apr 2, 2020  30-month Nat'l Phase: March 26, 2021 |
| | | | US 17/280,498 | Pending |
| | | | AU 2019351273 | Pending |
| | | | BR 112021005596-7 | Pending |
| | | | CA 3,113,259 | Pending |
| | | | CN 201980075999.7 | Pending |
| | | | CO NC2021/0005207 | Pending |
| | | | EP 19864650.7 | Pending  Published: EP 3856207 Aug 4, 2021 |
| | | | EA (Eurasia) 202190862 | Pending |
| | | | HK via EP 62022047508.6 | Registered |
| | | | IN 202117018463 | Pending |
| | | | IL 281792 | Pending |
| | | | JP 2021-517298 | Pending |
| | | | KR 10-2021-7012709 | Pending |
| | | | MX/a/2021/003262 | Pending |
| | | | SG 11202102878T | Pending |
| **GEN-IO-004 family:  IA RATIOS** | | | | |
| TREATMENT METHODS | Flechtner Dobson | PROV 1 | US 62/752,288 October 29, 2018 | Converted |

| | | | | |
|---|---|---|---|---|
| *(aka Inhibigen Ratios)*<br><br>*Patient selection for oncology.* | (Genocea) | | | |
| | | PROV 2a | US 62/788,309<br>January 4, 2019<br><br>*(w/ ratios figure 7)* | Abandoned at PCT conversion |
| | | PROV 2b | US 62/788,313<br>January 4, 2019<br><br>*(w/out ratios figure 7)* | Converted |
| | | PROV 3 | US 62/855,332<br>May 31, 2019<br><br>*(from Prov 2b)* | Converted |
| | | PCT | PCT/US2019/058578<br>October 29, 2019 | Nationalized<br><br>Published:<br>WO 2020/092379<br>May 7, 2020<br><br>30-month Nat'l Phase:<br>April 29, 2021 |
| | | | US 17/289,623 | Pending |
| | | | AU 2019373241 | Pending |
| | | | CA 3,116,594 | Pending |
| | | | CN 201980076012.3 | Pending |
| | | | EP 19878607.1 | Pending<br><br>Published;<br>EP 3873614<br>Sept 8, 2021 |
| | | | JP 2021-523867 | Pending |
| **GEN-IO-007 family: IA FOR AUTOIMMUNE DISEASE** | | | | |
| TREATMENT METHODS<br><br>*(aka Inhibigens for AI)* | DeVault<br>Starobinets<br>Dadali-Abel<br>Lam<br>Flechtner<br><br>(Genocea) | PROV 1 | US 63/042,475<br>June 22, 2020 | Abandoned and refiled with additional data |
| TREATMENT METHODS<br><br>*(aka Inhibigens for AI)* | DeVault<br>Starobinets<br>Dadali-Abel<br>Lam<br>Flechtner<br><br>(Genocea) | PROV 1 | US 63/278,844<br>Nov 12, 2021 | Pending |
| | | PROV 2 | US 63/328,532<br>Apr 7, 2022 | Pending |
| | | PCT | tbd | Conversion date:<br>Nov 12, 2022 |
| **GEN-IO-008 family: BIOMARKERS FOR CANCER PROGRESSION AND TX SELECTION** | | | | |
| TREATMENT METHODS<br><br>*(aka CPI Dx, CPI Dx Selection)* | Flechtner<br>+<br>DeVault<br>Lam<br>Starobinets<br><br>(Genocea) | PROV 1 | US 63/078,313<br>Sept 14, 2020 | Pending |
| | | PROV 2 | US 63/111,505<br>Nov 9, 2020 | Pending |
| | | PROV 3 | US 63/140,721<br>Jan 22, 2021 | Pending |
| | | PROV 4 | US 63/173,148<br>Apr 9, 2021 | Pending |

128335387_7

| | | PROV 5 | US 63/186,541 May 10, 2021 | Pending |
| | | PROV 6 | US 63/197,101 June 4, 2021 | Pending |
| | | PCT | PCT/US21/50332 [Sept 14, 2021] | Pending<br><br>Published:<br>WO 2020/056491<br>Mar 17, 2022<br><br>30-month Nat'l Phase:<br>Mar 14, 2023 |

8

## Schedule 1.1.4

## Licenses

Amended and Restated License Agreement, dated November 19, 2012, by and between Genocea Biosciences, Inc. and President and Fellows of Harvard College

## Schedule 1.1.6

## Equipment

| Manufacturer | Model # | Equipment |
|---|---|---|
| Eppendorf | 6325 | Eppendorf Master Cycler |
| Eppendorf | 6325 | Eppendorf Master Cycler |
| Eppendorf | 6325 | Eppendorf Master Cycler |
| Eppendorf | 6325 | Eppendorf Master Cycler |
| New Brunswick | Excella E24R | Refrigerated Incubator Shaker |
| Thermo | Sorvall Legend | Centrifuge |
| Perkin Elmer | AJL8M01 | Janus Robot - Arigato |
| Perkin Elmer | AJL8M02 | Janus Robot - Domo |
| Meso Scale Diagnostics | MSD | MSD |
| Frigidaire | FRU17B2JW10 | 2 - 8C |
| Sorvall | Sorvall | Centrifuge |
| Beckman Coulter | NXP | Biomek Robot 1 |
| Beckman Coulter | NXP | Biomek Robot 2 |
| NuAire | NU9668 | Minus 80 |
| Frigidaire | FCRS201RFB4 | 2-8c |
| Thermo | 7404 | LN2 Storage #1 |
| Thermo | REL2304A22 | 2-8c |
| Thermo | UGL2320A20 | Minus 20 |
| Thermo | UGL2320A20 | Minus 20 |
| New Brunswick | ExcellaE24 | Incubator Shaker |
| New Brunswick | Iseries24 | Incubator Shaker |
| Kenmore | 25328042808 | minus 20 |
| True | T49 | Deli fridge 2-8c |
| EMD Millipore | Easy Cyte 12HT | Guava Easy Cyte 12 HT |
| Sorvall | Legend RT | Centrifuge |
| Sorvall | Legend xrt | Centrifuge |
| Life | Evos Auto | EVOS cell imager auto imager |
| Thermos | 370 | $CO_2$ Incubator (stackable) |
| Thermos | 370 | $CO_2$ Incubator (stackable) |

10

| Manufacturer | Model # | Equipment |
|---|---|---|
| Thermo | RLR2111A14 | Fridge 2-8c |
| Miltenyi Biotech | autoMacs Pro | Auto Macs |
| Zebra | ZT410 | Zebra Label Maker |
| Agilent | 01862-201 | plate sealer |
| Mettler | PB602S | balance |
| Tecan | Freedom EVO | Tecan - Fredom EVO |
| Denville | C200 | microplate centrifuge |
| BD | C6 Plus | BD Acuri C6 Plus |
| Biotek | ELX406 | EL406 Combination Microplate Washer Dispenser |
| Thermo | Combi NL | Multidrop Combi |
| Thermo | Combi NL | Multidrop Combi |
| Thermo | ULT1790-10-D | Chest Freezer -86 |
| Integra | Viaflo 384 | Viaflo |
| PerkinElmer | I30 - I/C Dispense Head I30 70243570 | Janus - 384well head |
| BD | C6 Plus | BD Acuri C6 Plus |
| Labcyte | Echo525 | Echo |
| PerkinElmer | I30 - I/C Dispense Head I30 70243570 | Janus - 384well head |
| PerkinElmer | JanusGripper | Janus - Gripper Option |
| Thermofisher | Heracell Vios 160i | HERAcell Incubator |
| Thermofisher | Heracell Vios 160i | HERAcell Incubator |
| Thermo Scientific | CE8140 | CryoExtra 40 |
| Sartorius | iQUE3 | iQUE3 Flow Cytometer |
| Tecan | Fluent 1080 | Fluent 1080 Liquid Handler |
| Schneider Electric | GVSUPS50KB4D / GVSBPSU80G | Galaxy VS UPS and Bypass Cabinet |
| Nikon | Eclipse Ti2-U | Ti2-U Inverted Microscope |
| Bionex | 14-04702 | Hig4 Automated Centrifuge |
| Bionex | 14-04702 | Hig4 Automated Centrifuge |
| HighRes | PFOX-MA-00000 | Acell Robot |
| Thermo | CYTOMAT 2 C450-LiN | Cytomat 2 Automated Incubator |
| Brooks | 4TI-0665 | a4S Automatic Heat Sealer |

11

| Manufacturer | Model # | Equipment |
|---|---|---|
| Brooks | 4TI-0665 | a4S Automatic Heat Sealer |
| Inheco | ODTC 96 XL | ODTC 96 Thermal Cycler |
| Inheco | ODTC 96 XL | ODTC 96 Thermal Cycler |
| Inheco | ODTC 96 XL | ODTC 96 Thermal Cycler |
| Inheco | ODTC 96 XL | ODTC 96 Thermal Cycler |
| Inheco | ODTC 96 XL | ODTC 96 Thermal Cycler |
| Inheco | ODTC 96 XL | ODTC 96 Thermal Cycler |
| Brooks | XP-A | Xpeel |
| Agilent | MFXP2-SN | MultiFlo FX Microplate Dispenser |
| Sionix | SQUIX 2/600P | SciPrint MP2 Barcode Printer |
| HighRes | AMBISTORE M | Ambistore M |
| HighRes | TUNDRASTORE D | TundraStrore D |
| Atlas Copco | SF 11+ | Air Compressor |
| Atlas Copco | CD 20+ | Air Dryer |

12

## Schedule 1.4

## Contracts

1. Janssen Collaboration & Option Agreement
2. License Agreement with President and Fellows of Harvard College
3. Joint Assignment: Docket Number 2007781-0260; Application Number 63/078,313; Inventors Victoria DeVault, Huber Lam, Hanna Starobinets: December 2020*
4. Assignment: Docket Number 2007781-0260; Application Number 63/078,313; Inventor Jessica Flechtner; October 2020*
5. Joint Assignment: Docket Number 2007781-0275; Application Number 63/111,434; Inventors Lisa McNeil, Victoria DeVault, James Perry, Hubert Lam, Adrienne Li; December 2020*
6. Joint Assignment: Docket Number 2007781-0276; Application Number 63/111,505; Inventors Victoria DeVault, Hubert Lam, Hanna Starobinets, Jessica Flechtner; December 2020*
7. Joint Assignment: Docket Number 2007781-0204; Application Number 62/788,309; Inventors Jessica Flechtner, Jason Dobson; February 2019*
8. Joint Assignment: Docket Number 2007781-0201; Application Number 62/737,862; Inventors Jessica Flechtner, Marie Losskey-Elias, Pamela Carroll, Hubert Lam, Lisa McNeil, Wendy Broom; February 2019*
9. Joint Assignment: Docket Number 2007781-0202; Application Number 62/752,288; Inventors Jessica Flechtner, Jason Dobson; February 2019*
10. Joint Assignment: Docket Number 2007781-0205; Application Number 62/788,313; Inventors Jessica Flechtner, Jason Dobson; February 2019*
11. Joint Assignment: Docket Number 2007781-0188; Application Number 62/737,832; Inventors Jessica Flechtner, Marie Losskey-Elias, Pamela Carroll, Hubert Lam, Lisa McNeil, Wendy Broom; February 2019*
12. Joint Assignment: Docket Number 2007781-0203; Application Number 62/757,915; Inventors Jessica Flechtner, Marie Losskey-Elias, Pamela Carroll, Hubert Lam, Lisa McNeil, Wendy Broom; February 2019*
13. Joint Assignment: Docket Number 2007781-0324; Application Number 63/328,532; Inventors Hanna Starobinets, Victoria DeVault, Hubert Lam, Tulin Dadali-Abel, Jessica Flechtner; May 2022*
14. Joint Assignment: Docket Number 2007781-0324; Application Number 63328532; Inventors Hanna Starobinets, Victoria DeVault, Hubert Lam, Tulin Dadali-Abel, Jessica Flechtner; April 2022*
15. Joint Assignment: Docket Number 2007781-0251; Application Number PCT/US20/33277; Inventors Jessica Flechtner, Seth Hetherington, Thomas Heineman, Lisa McNeil; June 2020*
16. Joint Assignment: Docket Number 2007781-0250; Application Number 63/004,388; Inventors Lisa McNeil, Victoria DeVault, James Perry, Hubert Lam, Adrienne Li; July 2020*

17. Joint Assignment: Docket Number 2007781-0252; Application Number 63/023,708; Inventors Lisa McNeil, Victoria DeVault, James Perry, Hubert Lam, Adrienne Li; July 2020*

*Items marked with an * are included solely to the extent related to the Purchased Assets.

14

## **Schedule 3.3**

## **Disclosures regarding condition of ATLAS Equipment**

[To be completed by Seller]

**EXHIBIT 1.5.1**

**JOINT ESCROW INSTRUCTIONS**

1. <u>Establishment of Escrow Account</u>.  Pursuant to Section 1.5.1 of the attached Asset Purchase Agreement (the "<u>Purchase Agreement</u>"),[1] (a) Buyer shall deliver to Rock Creek Advisors, LLC, as escrow agent (together with its successors, "<u>Escrow Agent</u>") cash in the amount of $200,000 (the "<u>Deposit</u>"), which amount represents a portion of the Purchase Price as set forth in the Purchase Agreement.  Such amount, together with all other amounts from time to time held by Escrow Agent pursuant to the terms hereof, are herein referred to as the "<u>Escrow Funds</u>."  Escrow Agent hereby agrees to hold the Escrow Funds in a non-interest bearing account at TD Bank (the "<u>Escrow Account</u>") as provided in these Joint Escrow Instructions.  The purpose of the Escrow Account is to provide a source from which any amounts which may become owing to Seller under the Purchase Agreement may be paid.

2. <u>Disposition of Escrow Funds</u>.  Escrow Agent will hold the Escrow Funds in its possession in the Escrow Account until authorized hereunder to deliver such Escrow Funds as follows:

2.1.    As provided in a joint written direction of Buyer and Seller;

2.2.    As provided in a written direction by Buyer or Seller following termination of the Purchase Agreement pursuant to Section 10 of the Purchase Agreement, <u>provided</u>, <u>however</u>, if the Bankruptcy Court has approved a sale of the Purchased Assets to a bidder other than Buyer and Buyer is not approved as a backup bidder, then the Escrow Funds shall be immediately released; or

2.3.    As provided in an order of the Bankruptcy Court or other court of competent jurisdiction.

3. <u>Escrow Agent</u>.

3.1.    Escrow Agent shall have no duties or responsibilities, including, without limitation, any duty to review or interpret the Purchase Agreement, except those expressly set forth herein.  Buyer acknowledges that Rock Creek Advisors, LLC is financial advisor to Seller and agrees that Rock Creek Advisors, LLC may continue to advise Seller, including in connection with any dispute related to the Purchase Agreement or the Escrow Funds.

3.2.    If Escrow Agent shall be uncertain as to its duties or rights hereunder or shall receive instructions from Buyer or Seller with respect to the Escrow Account, which, in its opinion, are in conflict with any of the provisions of this Escrow Agreement, or if Buyer or Seller, for any reason, contests instructions delivered by the other with respect to the Escrow Account, it shall be entitled to refrain from taking any action until it shall be directed otherwise

---

[1]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Purchase Agreement.

in writing by Buyer and Seller or by order of the Bankruptcy Court or other court of competent jurisdiction.  Escrow Agent shall be protected in acting upon any notice, request, waiver, consent, receipt, or other document reasonably believed by Escrow Agent to be signed by the proper party or parties.

3.3.    Escrow Agent shall not be liable for any error or judgment or for any act done or step taken or omitted by it in good faith or for any mistake of fact or law, or for anything that it may do or refrain from doing in connection herewith, except its own bad faith, gross negligence or willful misconduct, and Escrow Agent shall have no duties to anyone except Buyer and Seller. Escrow Agent shall not be responsible for any liability related to the selection of the financial institution in which the Escrow Funds are maintained.

3.4.    Escrow Agent may consult legal counsel in the event of any dispute or question as to the construction of these Joint Escrow Instructions, or Escrow Agent's duties hereunder, and Escrow Agent shall incur no liability and shall be fully protected with respect to any action taken or omitted in good faith in accordance with the opinion and instructions of such counsel.

3.5.    In the event of any disagreement between Buyer and Seller or either of them, and/or any other person, resulting in adverse claims and demands being made in connection with or for the Escrow Funds, Escrow Agent shall be entitled at its option to refuse to comply with any such claim or demand, so long as such disagreement shall continue, and in so doing Escrow Agent shall not be or become liable for damages or interest to Buyer or Seller or to any person named herein for its failure or refusal to comply with such conflicting or adverse demands. Escrow Agent shall be entitled to continue so to refrain and refuse so to act until all differences shall have been resolved by agreement and Escrow Agent shall have been notified thereof in writing signed by Buyer and Seller.  In the event of such disagreement, Escrow Agent in its discretion may file a suit in interpleader in the Bankruptcy Court for the purpose of having the respective rights of the claimants adjudicated, if Escrow Agent determines such action to be appropriate under the circumstances, and may deposit with the Bankruptcy Court the Escrow Funds and any other property held hereunder.  Buyer and Seller, jointly and severally, each agree to pay all out-of-pocket costs and expenses incurred by Escrow Agent in such action, including reasonable attorney's fees (and Buyer and Seller agree that if such costs have not previously been paid that such costs shall be paid from the Escrow Funds prior to the disbursement of such funds).  Solely as between Buyer and Seller, Buyer and Seller agree to be equally responsible for such costs.

3.6.    Buyer and Seller hereby jointly and severally indemnify, defend, and hold Escrow Agent harmless from all losses, costs, and expenses that may be incurred by it as a result of its involvement in any arbitration or litigation arising between the Seller and the Buyer from the performance of its duties hereunder, *provided* that such losses, costs, and expenses shall not have resulted from the bad faith, willful misconduct, or gross negligence of Escrow Agent.  Solely as between Buyer and Seller, such indemnification shall be borne in equal proportions by Buyer and Seller.  Such indemnification shall survive termination of the escrow established hereunder until extinguished by any applicable statute of limitations.

3.7.    Escrow Agent does not own or have any interest in the Escrow Account or the Escrow Funds but is serving as escrow holder only, having only possession thereof and agreeing

to hold and distribute the Escrow Funds in accordance with the terms and conditions of this Escrow Agreement. This paragraph shall survive notwithstanding any termination of this Escrow Agreement or the resignation of Escrow Agent.

   3.8. Escrow Agent (and any successor Escrow Agent) may at any time resign as such by delivering the Escrow Funds to (i) any banking corporation or trust company organized under the laws of the United States or of any state which corporation or company is jointly designated by the other parties hereto in writing as successor escrow agent and consents in writing to act as successor escrow agent or (ii) the Bankruptcy Court or any other court of competent jurisdiction; whereupon Escrow Agent shall be discharged of and from any and all further obligations arising in connection with this Escrow Agreement. The resignation of the Escrow Agent will take effect on the earlier of (x) the appointment of a successor escrow agent by Buyer and Seller and delivery of the Escrow Funds to such successor escrow agent (or delivery of the Escrow Funds to the Bankruptcy Court or any other court of competent jurisdiction) or (y) the day that is 60 days after the date of delivery of its written notice of resignation to Buyer and Seller. If at that time the Escrow Agent has not received a designation of a successor escrow agent, the Escrow Agent's sole responsibility after that time shall be to safekeep the Escrow Funds until receipt of a designation of successor escrow agent, a joint written instruction as to disposition of the Escrow Funds by Buyer and Seller, or a final order of the Bankruptcy Court or any other court of competent jurisdiction mandating disposition of the Escrow Funds.

Dated: August 2, 2022

ACKNOWLEDGED AND AGREED:

**Rock Creek Advisors, LLC, Escrow Agent**

By: _James gansman_____

Name: __James gansman_____

Title: __President_____

**Harpy Holdings, LLC**

By: _____

Name: Robert Bernard, President

**Genocea Biosciences, Inc., Seller**

By: _William Clark_____

Name: William Clark. Chief Executive Officer

to hold and distribute the Escrow Funds in accordance with the terms and conditions of this Escrow Agreement.   This paragraph shall survive notwithstanding any termination of this Escrow Agreement or the resignation of Escrow Agent.

   3.8.     Escrow Agent (and any successor Escrow Agent) may at any time resign as such by delivering the Escrow Funds to (i) any banking corporation or trust company organized under the laws of the United States or of any state which corporation or company is jointly designated by the other parties hereto in writing as successor escrow agent and consents in writing to act as successor escrow agent or (ii) the Bankruptcy Court or any other court of competent jurisdiction; whereupon Escrow Agent shall be discharged of and from any and all further obligations arising in connection with this Escrow Agreement.  The resignation of the Escrow Agent will take effect on the earlier of (x) the appointment of a successor escrow agent by Buyer and Seller and delivery of the Escrow Funds to such successor escrow agent (or delivery of the Escrow Funds to the Bankruptcy Court or any other court of competent jurisdiction) or (y) the day that is 60 days after the date of delivery of its written notice of resignation to Buyer and Seller.  If at that time the Escrow Agent has not received a designation of a successor escrow agent, the Escrow Agent's sole responsibility after that time shall be to safekeep the Escrow Funds until receipt of a designation of successor escrow agent, a joint written instruction as to disposition of the Escrow Funds by Buyer and Seller, or a final order of the Bankruptcy Court or any other court of competent jurisdiction mandating disposition of the Escrow Funds.

Dated: [_____, 2022]

ACKNOWLEDGED AND AGREED:

**Rock Creek Advisors, LLC, Escrow Agent**

By: _____

Name: _____

Title: _____

**Harpy Holdings, LLC**

By: _____

Name: Robert Bernard, President

**Genocea Biosciences, Inc., Seller**

By: _____

Name: William Clark. Chief Executive Officer

## **EXHIBIT 5.2**

**BILL OF SALE**

[To be added]

127810632_8
45678/0002-43547096v2

## **EXHIBIT 5.3**

## **ASSIGNMENT OF PATENTS**

[To be added]

# **EXHIBIT 5.4**

## **ASSIGNMENT OF TRADEMARKS**

[To be added]

**<u>EXHIBIT 5.5</u>**

**ASSIGNMENT OF LICENSES**

[To be added]

# **EXHIBIT 6**

## **ASSIGNMENT OF CONTRACTS**

[To be added]